**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
|     Manuel Antunes, | : | |
|         Debtor. | : | Bankruptcy No. 15-16553-MDC |

# MEMORANDUM

## I. INTRODUCTION

On January 22, 2019, the Court entered an order (the "Sale Order")[1] granting the motion of Robert H. Holber, Chapter 7 Trustee (the "Chapter 7 Trustee") to sell property located at 360 Pineville Road, Upper Makefield, Pennsylvania (the "Pineville Property") for the benefit of the estate of Manuel Antunes (the "Debtor"). On January 24, 2019, the Debtor and his wife, Judith Antunes ("Mrs. Antunes," and together with the Debtor, the "Antunes") filed a Notice of Appeal of the Sale Order.[2] Pursuant to Local Bankruptcy Rule 8003-1, this Memorandum supports the Court's entry of the Sale Order.

## II. FACTUAL/PROCEDURAL HISTORY

### A. Relevant Procedural History

There are a number of events in the Debtor's bankruptcy case that culminated in the entry of the Sale Order. Those events were relevant to the Court's decision in entering the Sale Order, and therefore are summarized here.

#### 1. Initial Chapter 13 Filing and Ultimate Conversion to Chapter 7

The Debtor filed a voluntary bankruptcy petition under chapter 13 of the Bankruptcy Code, 11 U.S.C. §101 *et. seq.* (the "Bankruptcy Code") on September 11, 2015.[3] On August 3, 2016, the Debtor filed a motion to convert his case to a case under chapter 11,[4] which the Court granted on September 1,

---

[1] Bankr. Docket. No. 436.
[2] Bankr. Docket No. 442.
[3] Bankr. Docket No. 1.
[4] Bankr. Docket No. 124.

2016.[5] On December 12, 2016, the Acting United States Trustee for Region Three (the "U.S. Trustee") filed a motion to convert the Debtor's case to a case under chapter 7 of the Bankruptcy Code or, in the alternative, dismiss it and bar the Debtor from refiling for two years (the "U.S. Trustee Conversion Motion").[6]

On March 20, 2017, the Court held an evidentiary hearing on the U.S. Trustee Conversion Motion. At that hearing, Mrs. Antunes testified that after the Debtor's case was converted to chapter 11, she had received certain of the Debtor's payroll checks from Manchester Construction Co., Inc., an entity owned and operated by the Debtor's son, and certain rent checks for properties the Debtor owned, but had not deposited them into the Debtor's debtor-in-possession bank account at TD Bank, N.A. (the "DIP Account").[7] On March 21, 2017, the Court entered an Order converting the Debtor's case to chapter 7 (the "Conversion Order").[8] The Conversion Order directed the Debtor (i) to deposit all outstanding payroll and rent checks into the DIP Account no later than March 24, 2017, and (ii) to file a certificate of compliance (the "Certificate of Compliance") with respect to that obligation on or before March 27, 2017.[9]

On May 8, 2017, approximately six (6) weeks after the deadline for doing so, the Debtor filed the Certificate of Compliance, certifying that the Debtor "complied with the March 21, 2017 Order by depositing all issued, but not deposited, payroll checks for Manuel Antunes and all received, but not deposited, rent checks, as of March 21, 2017."[10] The Certificate of Compliance therefore expressly certified that the Debtor had deposited rent checks into the DIP Account. On May 11, 2017, the U.S. Trustee filed an objection to the tardy Certificate of Compliance (the "Compliance Objection"),[11] in part

---

[5] Bankr. Docket No. 134.
[6] Bankr. Docket No. 181.
[7] March 20, 2017 Hearing Transcript at 174:5 to 175:6; 178:8 to 178:23; 198:9 to 199:5; 202:14 to 202:20; 203:1 to 204:12; 206:13 to 206:23.
[8] Bankr. Docket No. 221.
[9] Conversion Order, at ¶¶ 2 and 3.
[10] Bankr. Docket No. 250.
[11] Bankr. Docket No. 256.

2

because the Debtor failed to file any documents verifying the deposits the Debtor allegedly made. On June 14, 2017, the Court held a hearing on the Compliance Objection, after which the Court ordered the Debtor to file an amended Certificate of Compliance by June 21, 2017.[12] The Debtor did not file an amended Certificate of Compliance by that deadline or at any time thereafter.

### 2.    Chapter 7 Trustee's Objection to the Debtor's Claimed Exemptions

On May 8, 2017, the Debtor filed an amended Schedule C, identifying the property he was claiming as exempt pursuant to §522(b)(3) of the Bankruptcy Code and applicable nonbankruptcy law (the "Amended Exemptions").[13] On June 13, 2017, the Chapter 7 Trustee filed an objection to the Amended Exemptions (the "Exemption Objection"),[14] challenging the Debtor's claimed exemption under Pennsylvania law for seven parcels of real property (the "Real Property"), including the Pineville Property.

On December 11, 2017, the Chapter 7 Trustee filed a motion seeking approval of a proposed settlement of the Exemption Objection (the "Exemption Settlement").[15] Pursuant to the Exemption Settlement, the Debtor and the Chapter 7 Trustee stipulated that the Debtor's interests in the Pineville Property and the property located at 2104 Brookhaven Drive, Yardley, Pennsylvania (the "Brookhaven Property") were not exempt and constituted property of the estate.[16] The Chapter 7 Trustee was authorized to sell the Pineville Property pursuant to §363 of the Bankruptcy Code, with the Antunes reserving the right to object on the basis of marketing process, value and price.[17] Mrs. Antunes also reserved the right under the Exemption Settlement to submit a competing offer for the Pineville Property.[18] The Exemption Settlement expressly provided that any such bid or offer by Mrs. Antunes

---

[12] Bankr. Docket No. 274.
[13] Bankr. Docket No. 243.
[14] Bankr. Docket No. 267.
[15] Bankr. Docket No. 331.
[16] Exemption Settlement, at ¶2.
[17] Exemption Settlement, at ¶6.
[18] *Id.*

3

would be treated by the Chapter 7 Trustee in the same fashion any third-party bid would be treated, and in order to be considered it would need to be a higher and better bid and include evidence satisfactory to the Chapter 7 Trustee, in his reasonable discretion, that Mrs. Antunes had sufficient financial wherewithal to consummate the transaction.[19] The Exemption Settlement further expressly stated that the Court would determine if any proposed sale of the Pineville Property was the highest and best price under the circumstances.[20] On January 17, 2018, the Court entered an Order approving the Exemption Settlement.[21]

### 3. U.S. Trustee's Objection to the Debtor's Discharge

On June 22, 2017, the U.S. Trustee filed an adversary complaint against the Debtor to object to his discharge pursuant to §727 of the Bankruptcy Code (the "Discharge Adversary").[22] In general, the U.S. Trustee alleged that the Debtor (i) failed to disclose assets, the transfer of assets, and income in his sworn schedules and statements of financial affairs, (ii) provided false testimony to the Court and the U.S. Trustee regarding his financial affairs, (iii) withheld records and documents relating to his financial affairs from the U.S. Trustee, (iv) concealed income that constituted property of the estate, (v) concealed, destroyed, mutilated, falsified or failed to keep or preserve recorded information without justification, and (vi) failed to satisfactorily explain the dramatic decrease in his purported monthly income between October 2015 and May 2017. On June 18, 2018, just prior to the scheduled trial in the Discharge Adversary, the Court entered a stipulated Order denying the Debtor's discharge pursuant to §727 of the Bankruptcy Code.[23]

---

[19] *Id.*

[20] *Id.* The Exemption Settlement also provided for the sale of the Brookhaven Property in the event the net proceeds from sale of the Pineville Property were insufficient to pay in full 100% of the claims of the Debtor's estate. Exemption Settlement, at ¶12.

[21] Bankr. Docket No. 358.

[22] Bankr. Docket No. 279; Adv. Pro. 17-00178 Docket No. 1.

[23] Bankr. Docket 395.

    **4.**    **Chapter 7 Trustee's Adversary Complaint to Recover Estate Assets**

On April 20, 2018, the Chapter 7 Trustee filed an adversary complaint (the "Estate Assets Adversary Complaint")[24] against the Debtor, Manchester Construction, Inc. ("Manchester"), Manuel Antunes, Jr. ("Antunes Jr."), and, the Antunes' son-in-law, Giuseppe Marrero ("Marrero"). In general terms, the Estate Assets Adversary Complaint sought (i) a declaratory judgment that the Debtor was the true owner of Manchester, with the equity of Manchester being property of the estate available for liquidation to satisfy the claims against the Debtor's estate, (ii) a declaration that Manchester was liable for the Debtor's debts, enjoining Manchester from transferring any assets without first satisfying the estate's debts, and imposing a constructive trust of Manchester's assets for the benefit of the estate, (iii) a judgment for all unpaid rent Manchester owed the Debtor for occupying one of the Debtor's Properties, and (iv) judgment for all unpaid rent Marrero owed the Debtor for occupying the Brookhaven Property.

    **5.**    **Chapter 7 Trustee's Sale Motion**

        **i.**    **The Purchaser's Original Offer and the Revised Offer for the Pineville Property**

On April 20, 2018, the Chapter 7 Trustee also filed a motion for approval of the sale of the Pineville Property on an "as-is, where-is" basis to the Debtor's neighbor, Michael C. Meister or his Assignee (the "Purchaser") for a purchase price of $450,000.00, subject to continued marketing and higher and better offers (the "Original Offer"). The Purchaser's Original Offer waived all inspection contingencies with the exception of an inspection of an on-site water system (the "On Lot Sewage Inspection"), the failure of which constituted grounds for the Purchaser to terminate the Agreement of Sale.

On June 12, 2018, however, the Chapter 7 Trustee filed a revised sale motion with respect to the Pineville Property (the "Revised Sale Motion").[25] The Revised Sale Motion stated that the Pineville Property failed the On Lot Sewage Inspection, prompting the Purchaser to revoke the Original Offer as

---

[24] Bankr. Docket No. 380; Adv. Pro. 18-00097 Docket No. 1.
[25] Bankr. Docket No. 392.

5

permitted under the Agreement of Sale. The Revised Sale Motion further stated that "the Trustee and the [Purchaser] discovered other circumstances that make the [Pineville] Property worth just a fraction of the initial value," forcing the Chapter 7 Trustee to withdraw the original sale motion.[26] The Chapter 7 Trustee renegotiated a purchase price of $100,000.00 with the Purchaser (the "Revised Offer"), which offer was not subject to any contingencies. The Revised Offer, similar to the Purchaser's Original Offer, was subject to the Chapter 7 Trustee's continued marketing of the Pineville Property for higher and better offers, including from Mrs. Antunes.

On July 6, 2018, the Antunes filed a response to the Revised Sale Motion (the "Antunes Response").[27] In general terms, the Antunes objected to the Revised Offer as constituting an inadequate sale price and to the marketing of the Pineville Property as inadequate. The Antunes Response also included a $110,000.00 offer from Mrs. Antunes for the Pineville Property.

### ii.    Denial of the Parties' Sale Settlement Motion

On August 15, 2018, after multiple continuances, the Court held a hearing on the Revised Sale Motion. At that hearing, counsel for the Chapter 7 Trustee and counsel for the Antunes advised the Court that they had reached a tentative settlement regarding the Revised Sale Motion and the Estate Assets Adversary Complaint, which included an increased offer of $120,000.00 from the Antunes for the Pineville Property.[28] At that time the Court encouraged the parties to reduce their agreement to writing and submit it to the Court for approval.[29]

On September 27, 2018, the Chapter 7 Trustee filed an expedited motion seeking approval of the proposed settlement with the Antunes (the "Sale Settlement Motion").[30] The Sale Settlement Motion, which did not attach a proposed settlement agreement or other document detailing the terms of the

---

[26] Revised Sale Motion, at ¶12.

[27] Bankr. Docket No. 398.

[28] August 15, 2018 Hearing Transcript at 7:5 to 8:22.

[29] August 15, 2018 Hearing Transcript at 37:13 to 37:22.

[30] Bankr. Docket No. 408.

6

proposed settlement, outlined the settlement's terms. Most relevant for present purposes, the settlement contemplated that either the Debtor and/or Mrs. Antunes would purchase the Pineville Property for $120,000.00, with closing to occur on or before October 14, 2018.[31] The Sale Settlement Motion represented that "[t]he Debtor and/or Judith have paid a total deposit of $25,000.00 to the Trustee," and the settlement contemplated that in the event the Debtor and/or Judith did not close on the sale of the Pineville Property by October 14, 2018, "the Debtor and/or Judith shall forfeit $20,000.00 of the Deposit to the Trustee, for the benefit of the Debtor's estate."[32]

On October 10, 2018, the Court held an expedited hearing on the Sale Settlement Motion. At that hearing, the Court expressed concern regarding Mrs. Antunes' good faith and ability to purchase the Pineville Property given that, just one day prior to the hearing, Mrs. Antunes had filed a motion before Judge FitzSimon seeking authority to file a chapter 13 bankruptcy petition.[33] The Court's concern heightened at the hearing after inquiring how, in light of Mrs. Antunes' apparent financial distress, the Antunes paid a $25,000.00 deposit on the proposed purchase price. The Antunes' counsel advised that some portion of the deposit was funded from dated paychecks the Antunes received from Manchester, for which there had only recently been sufficient funding.[34] The Court reminded counsel that the Conversion Order directed the Debtor to deposit all outstanding pre-conversion payroll and rent checks into the DIP Account, and neither the Antunes' counsel nor the Chapter 7 Trustee's counsel could verify that the $25,000.00 deposit was not at least partially paid using the Debtor's paychecks that were subject to that

---

[31] Sale Settlement Motion at ¶ 14(a). The Sale Settlement Motion also provided for the Chapter 7 Trustee's abandonment of the estate's interest in the Brookhaven Property and the dismissal with prejudice of the Estate Assets Adversary Complaint, upon the satisfaction of certain conditions and the payment of an additional $41,000.00. Sale Settlement Motion at ¶14(b). Because those terms and conditions are not relevant to the Court's entry of the Sale Order, the Court does not belabor this Memorandum with a summary of them.

[32] Sale Settlement Motion at ¶¶13, 14(d).

[33] Audio Transcript, October 10, 2018 Hearing at 12:01 to 12:05 p.m. Mrs. Antunes had two prior bankruptcy cases before Judge Raslavich, both of which were dismissed for failure to make plan payments. Upon dismissal of Mrs. Antunes' second case, Judge Raslavich barred Mrs. Antunes from filing another bankruptcy petition, either individually or jointly with a spouse, without prior leave of Court. Judge FitzSimon inherited Mrs. Antunes' closed bankruptcy case upon the retirement of Judge Raslavich. Bankr. Case No. 12-14625, Docket No. 78.

[34] Audio Transcript, October 10, 2018 Hearing at 12:11 to 12:12 p.m.

7

directive.[35] Given these revelations at the hearing, the Court continued the hearing for 24 hours in order to allow the Antunes to produce documentary evidence that all of the Debtor's pre-conversion paychecks were deposited in the DIP Account, and that the $25,000.00 deposit did not include any of the Debtor's paychecks that were property of the estate subject to the Conversion Order.[36]

On October 11, 2018, at the continued hearing on the Sale Settlement Motion, the parties were not able to satisfactorily verify for the Court that all pre-conversion paychecks of the Debtor were deposited in the DIP Account in compliance with the Conversion Order. Counsel for the Antunes advised that, contrary to the express representation in the Certificate of Compliance, no pre-conversion rent checks were deposited in the DIP Account because Mrs. Antunes was allegedly mistaken when testifying at the March 21, 2017 hearing that rent checks were collected but not deposited.[37] Counsel for the Chapter 7 Trustee also advised the Court that the Chapter 7 Trustee believed the Debtor failed to deposit approximately $9,000.00 of pre-conversion funds into the DIP Account, but at the time of his appointment the Chapter 7 Trustee determined that the cost of pursuing that asset was outweighed by his belief that there were insufficient assets available to the estate to produce a return on hundreds of thousands of dollars in claims.[38] Given the Court's unanswered questions regarding the Antunes' compliance with the Conversion Order and the source of the $25,000.00 deposit the Antunes paid for the Pineville Property, the Court advised the parties that the proposed settlement would not be approved absent satisfaction of the Court's concerns.[39] As such, the Court required counsel for the Antunes to produce for the Court's review, as a supplement to the record, bank statements for the DIP Account (the "DIP Account Statements") from March 2017 forward in order to determine what deposits were made, as

---

[35] Audio Transcript, October 10, 2018 Hearing at 12:13 to 12:17 p.m.

[36] Audio Transcript, October 10, 2018 Hearing at 12:28 to 12:30 p.m.

[37] Audio Transcript, October 11, 2018 Hearing at 1:49 to 1:50 p.m.

[38] Audio Transcript, October 11, 2018 Hearing at 1:49 to 1:51 p.m. The Chapter 7 Trustee appears to have argued at the hearing that the estate was not harmed by the Antunes' retention of these funds because the Debtor could claim them as exempt, bringing them outside of the property of the estate. Audio Transcript, October 11, 2018 Hearing at 2:34 p.m. The Debtor's post-conversion Amended Exemptions, however, did not claim an exemption over any such retained funds. Bankr. Docket No. 243. Nor has the Debtor amended or claimed any such exemption after the hearing.

[39] Audio Transcript, October 11, 2018 Hearing at 1:55 to 1:56 p.m.

well as the first two months of statements from the Debtor's personal account that had been opened once the DIP Account was closed (the "Personal Account Statements," and together with the DIP Account Statements, the "Bank Account Statements").[40] The Court advised the parties that only after review of the Bank Account Statements would it rule on the Sale Settlement Motion.[41]

On October 17, 2018, counsel for the Antunes produced to the Court for an in-camera review (i) DIP Account Statements for the months of February 2017 through the account's closure in February 2018, and (ii) Personal Account Statements from the time it was opened in May 2017 through July 2017. The Court's review of the Bank Account Statements, rather than dispel the Court's concerns regarding the Antunes' apparent retention and use of estate funds after the Conversion Order was entered, instead only broadened the scope of the Court's concern. The DIP Account Statements reflected that, after the Conversion Order was entered, the Debtor and/or Mrs. Antunes made certain deposits in various amounts, most of which came in the approximately three weeks after the Conversion Order was entered, in a total amount of $16,187.96. The DIP Account Statements did not indicate whether these deposits were in the form of cash or check, however, and did not otherwise indicate to what the deposits related. Having been given no explanation of the entries in the Bank Account Statements from the Antunes, the Court was left with insufficient information to confirm that all pre-conversion paychecks of the Debtor were deposited in the DIP Account.

More concerning, however, was the DIP Account Statements' revelation that the Antunes continued to use funds in the DIP Account after conversion of the Debtor's case to Chapter 7 to make thousands of dollars of purchases for their personal use. For example, in the month following conversion, the Antunes deposited over $16,000.00 in the DIP Account, but amassed over $12,000.00 in charges, resulting in a net increase in the DIP Account of only approximately $3,500.00. The nature of the larger charges is not indicated by the DIP Account Statements, but smaller charges reflect the Antunes' use of

---

[40] Audio Transcript, October 11, 2018 Hearing at 2:36 to 2:37 p.m.

[41] Audio Transcript, October 11, 2018 Hearing at 2:35 to 2:36 p.m.

the DIP Account after conversion for purchases at, for example, Babies R Us, Primo Hoagies, Smoothie King, and Diva Nails Spa. In the following months, the Antunes continued to drain the DIP Account of funds to pay personal expenses at Acme, the Hair Cuttery, and Walmart, among others. On May 8, 2017, the same date that the Debtor filed the Certificate of Compliance with respect to the Conversion Order, the Antunes transferred $200.00 from the DIP Account to fund the opening of their personal account.[42] The end result of the checks, cash withdrawals and debit purchases the Antunes drew on the DIP Account in the months after conversion was that, rather than returning to the estate the pre-conversion rent and paychecks Mrs. Antunes had testified to withholding, the Antunes emptied the DIP Account of all funds before ultimately closing the account in February 2018 with a negative balance of $126.09.

On October 26, 2018, the Court held a telephonic conference call to advise the parties that, as a result of its review of the DIP Account Statements and continued concerns regarding the Antunes' use of estate property, it was denying the portion of the Sale Settlement Motion providing for the sale of the Pineville Property to Mrs. Antunes and/or the Debtor.[43] On November 1, 2018, the Court entered an Order denying the Sale Settlement Motion.[44]

### iii. Continued Sale Hearing and Approval of Revised Sale Motion

On December 14, 2018 and January 22, 2019, the Court continued the hearing on the Revised Sale Motion, and specifically consideration of the proposed sale of the Pineville Property to Purchaser pursuant to the Revised Offer. At that hearing, the Chapter 7 Trustee advised that an addendum to the Revised Offer had resulted in an increased proposed sale price of $120,000.00 (the "Final Offer"). Both the Chapter 7 Trustee and the Debtor elicited testimony regarding the sale process and the proposed sale to the Purchaser.

---

[42] It appears that this transfer may have been returned to the DIP Account from the Antunes' personal account on May 26, 2018, but the initial transfer from the DIP Account, as with the payment of personal expenses from the DIP Account, was unauthorized and impermissible.

[43] Audio Transcript, October 26, 2018 Hearing at 2:26 to 2:28 p.m.

[44] Bankr. Docket No. 415.

### a. The Real Estate Broker's Testimony

The Chapter 7 Trustee called as a witness Richard Astrella ("Mr. Astrella"), the real estate broker retained to list and sell the Pineville Property. Mr. Astrella testified regarding the listing, pricing history, and sale process for the Pineville Property. Specifically, the Pineville Property was listed on the Trend multiple listing system from June 2017 through the date of the hearing, as well as on Mr. Astrella's firm's website, which distributed the property listing to approximately sixty other real estate websites.[45] Mr. Astrella did a physical and electronic mailing to area developers.[46] There was also a sale sign physically posted on the Pineville Property.[47]

The initial listing price for the property was $699,000.00, which was subsequently lowered to $625,000.00.[48] Mr. Astrella received inquiries regarding the property but no other actionable offers until the Purchaser's Original Offer.[49] Mr. Astrella testified that after receiving the $450,000.00 Original Offer from the Purchaser in April 2018, the Purchaser's due diligence resulted in a report in May 2018 from the Purchaser's retained engineering firm (the "Engineer") stating that the Pineville Property could not, among other things, have a septic system.[50] Consequently, based on the undevelopable nature of the Pineville Property, in June 2018 the Purchaser exercised his right under the Agreement of Sale to terminate his offer, and instead submitted the Revised Offer of $100,000.00.[51]

Mr. Astrella testified that he continued to market the property and received multiple inquiries regarding the property from developers, with whom he did not share the Engineer's report or otherwise

---

[45] Audio Transcript, December 14, 2018 Hearing at 11:42 a.m.

[46] Audio Transcript, December 14, 2018 Hearing at 11:58 a.m.

[47] Audio Transcript, December 14, 2018 Hearing at 11:58 a.m.

[48] Audio Transcript, December 14, 2018 Hearing at 11:43 a.m.

[49] Audio Transcript, December 14, 2018 Hearing at 11:43 to 11:48 a.m. and 11:59 a.m. Mr. Astrella testified that he received one other offer for the Pineville Property in June 2017 for $525,000.00, but the prospective purchaser withdrew his offer upon finding another property. Audio Transcript, December 14, 2018 Hearing at 11:45 a.m.

[50] Audio Transcript, December 14, 2018 Hearing at 11:48 a.m.

[51] Audio Transcript, December 14, 2018 Hearing at 11:50 a.m.

discuss it.[52] In Mr. Astrella's opinion as a real estate broker, however, the Engineer's conclusion decreased the value of the Pineville Property.[53] Mr. Astrella testified that the Chapter 7 Trustee, once aware of the issues identified in the Engineer's report, determined to accept the Purchaser's Revised Offer.[54] Mr. Astrella testified that after submitting the Revised Offer, the Purchaser executed an addendum to the agreement of sale, increasing the proposed purchase price to $120,000.00, subject to no contingencies.[55] Mr. Astrella received no competing offers for the Pineville Property, and he believed the Final Offer represented the maximum amount the Debtor's estate could expect to receive for the Pineville Property.[56] Mr. Astrella did acknowledge that he did not reach out to the Engineer to discuss the report or obstacles to development, reasoning that he did not have the expertise used in the Engineer's analysis.[57]

On cross-examination, Mr. Astrella testified that at some point in time the sale sign at the Pineville Property either fell or was taken down, although he could not recall when that might have happened.[58] Regarding the Engineer's report, Mr. Astrella acknowledged that the Purchaser disclosed that he had used the Engineer for other projects before.[59] Mr. Astrella also admitted that he did not retain or suggest the Chapter 7 Trustee retain another engineering firm to examine the property or submit its own report regarding whether it could be developed.[60]

### b. The Chapter 7 Trustee's Testimony

The Chapter 7 Trustee testified that he believed that the Final Offer of $120,000.00 was the highest and best offer for the Pineville Property based on the amount of time it was on the market, the fact

---

[52] Audio Transcript, December 14, 2018 Hearing at 12:19 to 12:21 p.m.

[53] Audio Transcript, December 14, 2018 Hearing at 11:51 a.m.

[54] Audio Transcript, December 14, 2018 Hearing at 11:50 a.m.

[55] Audio Transcript, December 14, 2018 Hearing at 11:53 to 11:54 a.m.

[56] Audio Transcript, December 14, 2018 Hearing at 11:54 a.m.

[57] Audio Transcript, December 14, 2018 Hearing at 12:00 p.m.

[58] Audio Transcript, December 14, 2018 Hearing at 12:12 to 12:14 p.m.

[59] Audio Transcript, December 14, 2018 Hearing at 12:29 p.m.

[60] Audio Transcript, December 14, 2018 Hearing at 12:29 p.m.

that only two offers were made for the property during that time, and the Engineer's report concluding that the property had limited utility.[61] The Chapter 7 Trustee testified that when he retained Mr. Astrella to broker the sale of the Pineville Property, he set the initial sale price, in consultation with Mr. Astrella, between $600,000.00 to $700,000.00, based on Mr. Astrella's assessment of a potential sale price.[62] The Chapter 7 Trustee testified that he received an offer for the Pineville Property in June 2017 for $525,000.00, but that offer was withdrawn prior to the Chapter 7 Trustee accepting it.[63] After that offer was withdrawn the Chapter 7 Trustee did not receive any other offers until the Purchaser's Original Offer of $450,000.00, nearly a year later.[64] However, after the Purchaser forwarded the Engineer's report, the Chapter 7 Trustee and Mr. Astrella together came to the conclusion that the Purchaser's Revised Offer of $100,000.00 would be the best offer they would receive for the Pineville Property.[65] When asked on cross-examination whether he believed it made sense, after the Purchaser's initial offer of $450,000.00 was revoked, to market the property at a reduced listing price for some period of time, the Chapter 7 Trustee stated that he did not believe so given the development issues with the property and the length of time it was on the market without other offers at any price.[66] The Chapter 7 Trustee testified that he was satisfied with the marketing of the Pineville Property based on his years of experience selling properties as a bankruptcy trustee, and that he judged the value of the Pineville Property, and therefore whether the Revised Offer constituted the highest and best offer, based on the market's response, or lack thereof, to the Pineville Property.[67]

On cross examination the Chapter 7 Trustee confirmed he was aware that at some point the sale sign at the property had fallen or was taken down, but was not aware of whether the sign was ever put

---

[61] Audio Transcript, December 14, 2018 Hearing at 12:36 p.m.

[62] Audio Transcript, December 14, 2018 Hearing at 1:00 p.m.

[63] Audio Transcript, December 14, 2018 Hearing at 12:52 p.m.

[64] Audio Transcript, December 14, 2018 Hearing at 12:59 p.m.

[65] Audio Transcript, December 14, 2018 Hearing at 1:11 p.m.

[66] Audio Transcript, December 14, 2018 Hearing at 1:32 p.m.

[67] Audio Transcript, December 14, 2018 Hearing at 12:41 p.m.

back up.[68] The Chapter 7 Trustee also confirmed that he did not seek his own engineering report regarding whether the Pineville Property was capable of development because he was not confident he had sufficient funds in the estate to pay for such a report.[69] The Chapter 7 Trustee could not recall whether he was aware that the Purchaser had previously used the Engineer's firm on other projects.[70]

### c. Mrs. Antunes' Testimony

The Debtor called Mrs. Antunes as a witness, who testified only regarding the sale sign at the Pineville Property, which is located adjacent to her home. She testified that there initially had been a large sale sign posted on the property, but at some point Mr. Astrella made her aware that it was no longer up and inquired whether she had taken it down.[71] Mrs. Antunes testified that, at the time of the hearing, the sign was still on the property, but it was not up or visible to prospective purchasers.[72]

### d. The Debtor's Testimony

The Debtor also testified at the hearing, largely related to his belief regarding the purported value of the Pineville Property.[73] The Debtor testified that he believed the property was worth $460,000.00, based on what he believed were the values of comparable properties in the area of the Pineville Property.[74]

### e. The Court's Approval of the Revised Offer

At the conclusion of the hearing, the Court found that the Chapter 7 Trustee had exercised sound business judgment in accepting the Purchaser's Final Offer of $120,000.00. The Court found that the marketing of the Pineville Property online and through Mr. Astrella's contacts was sufficient. The Court

---

[68] Audio Transcript, December 14, 2018 Hearing at 12:43 p.m.

[69] Audio Transcript, December 14, 2018 Hearing at 1:20 p.m.

[70] Audio Transcript, December 14, 2018 Hearing at 1:35 p.m.

[71] Audio Transcript, December 14, 2018 Hearing at 2:05 p.m.

[72] Audio Transcript, December 14, 2018 Hearing at 2:06 p.m.

[73] Counsel for the Antunes also sought to have the Debtor qualified as an expert to testify regarding the contents of the Engineer's report, but the Court determined after hearing his qualifications and experience that he did not qualify to testify as an expert on such matters. Audio Transcript, December 14, 2018 Hearing at 2:12 to 2:32 p.m.

[74] Audio Transcript, January 22, 2019 Hearing at 1:39 to 1:50 p.m.

further found that the value of the Pineville Property was established by what a willing buyer would pay a willing seller, and the Final Offer represented the only offer for the Pineville Property, other than the Antunes' offer. The Court rejected the Antunes' argument that the Chapter 7 Trustee did not exercise proper business judgment because the property was worth significantly more than the Purchaser's Final Offer. The Court observed that there had not been any offer exceeding the Purchaser's Final Offer, and the Antunes had not offered more than the Final Offer, despite their position that the property was worth $450,000.00.[75]

## III. **DISCUSSION**

Section 363 of the Bankruptcy Code allows the Chapter 7 Trustee "after notice and a hearing [to] use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). In order for the proposed sale to be proper, the Chapter 7 Trustee must "satisfy [his] fiduciary duty to the debtor, creditors and equity holders, [by articulating some] business justification for using, selling, or leasing the property outside the ordinary course of business." *Sheehan v. Dobin*, 2011 U.S. Dist. LEXIS 46004, at *6-7 (D.N.J. Apr. 28, 2011) (quoting *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir.1986)).

The standard under §363(b) is well-settled – a debtor may sell assets outside the ordinary course of business when it has demonstrated that the sale of such assets represents the sound exercise of business judgment. *In re Elpida Memory, Inc.*, 2012 Bankr. LEXIS 5367, at *17 (Bankr. D. Del. Nov. 16, 2012). In determining whether a sale satisfies this standard, the courts in this Circuit require that a sale satisfy four considerations: (1) a sound business purpose exists for the sale; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith. *Id.*

---

[75] At the hearing, counsel for the Antunes stated that the Antunes were prepared to increase their offer for the Pineville Property by $9,000.00 to $129,000.00, presumably to compensate for the $9,000.00 the Chapter 7 Trustee had previously concluded the Debtor failed to deposit into the DIP Account upon conversion. The Court, however, found that Mrs. Antunes was not a good faith purchaser even if making that increased offer. Audio Transcript, January 22, 2019 Hearing at 1:26 to 1:29 p.m. Further, the increase offer did not constitute a higher and better offer because the additional $9,000.00 was money that belonged to the Debtor's estate and was wrongfully withheld upon conversion of the Debtor's case.

15

Moreover, great judicial deference is given to the Chapter 7 Trustee's exercise of his business judgment. *Sheehan*, 2011 U.S. Dist. LEXIS 46004, at *6-7 (*citing In re Gulf States Steel*, 285 B.R. 497, 516 (Bankr. N.D. Ala.2002)). The Court should accept the Chapter 7 Trustee's business judgment, unless there is evidence of bad faith. *In re Shubh Hotels Pittsburgh, LLC*, 439 B.R. 637, 639 (Bankr. W.D. Pa. 2010). In reviewing the Chapter 7 Trustee's exercise of his business judgment, the Court looks at whether the proposed transaction (1) represents a business decision, (2) is made with disinterestedness, (3) is made with due care, (4) is made in good faith, and (5) does not constitute an abuse of discretion or waste of assets. *Id.* (*citing In re Adelphia Communications Corp.*, 2004 Bankr. LEXIS 971 (Bankr. S.D.N.Y. June 22, 2004)).

It is evident to the Court that the proposed sale of the Pineville Property to the Purchaser for the Final Offer of $120,000.00 meets the standards for approval under §363(b). The Chapter 7 Trustee established that there was a fulsome marketing of the property for nearly one and a half years on multiple listing sites. Although the Chapter 7 Trustee's broker testified that he received multiple inquiries regarding the property, almost none resulted in an offer to purchase it. Rather, aside from the rescinded offer the Chapter 7 Trustee received in June 2017 for $525,000.00, the only non-insider to make an offer was the Purchaser. Furthermore, when the Purchaser's due diligence resulted in the failed On Lot Sewage Inspection, even his Original Offer was rescinded as permitted under the applicable Agreement of Sale. In the context of a property that was marketed for nearly 18 months without any competing offers other than the Antunes' fatally flawed offer, and in the face of the Engineer's report concluding that the property was not suitable for development, it was a sound exercise of the Chapter 7 Trustee's business judgment to accept the Final Offer of $120,000.00, rather than incur more expense and delay trying to find a buyer willing to make a better offer, a search that for 18 months had failed to bear any fruit. Under the less-than-optimal circumstances that existed with respect to the Pineville Property, the Court finds that the sale to the Purchaser represents a sound, disinterested business decision made with due care and in good faith, and it does not constitute an abuse of discretion or waste of estate assets. The Court also finds

16

that the Final Offer of $120,000.00 is fair under the circumstances, and the Purchaser is a good faith purchaser.[76]

Although the Antunes attempt to paint the Chapter 7 Trustee's failure to commission his own engineering report regarding the development of the property as a lack of proper business judgment, the Court does not agree. The Chapter 7 Trustee marketed the property for 18 months, with no buyers other than the Purchaser coming forward. The market had clearly told the Chapter 7 Trustee that there was little interest in the Pineville Property, and certainly not at the price which the Chapter 7 Trustee hoped to get. In those circumstances, it was a legitimate exercise of the Chapter 7 Trustee's business judgment to take "the bird in the hand" in the form of the Final Offer from the Purchaser, rather than incur the further expense and delay of another engineer's report and the possibility of losing even the Final Offer from the Purchaser.

The fact that the Purchaser had previously retained the Engineer for services on other projects does not taint the Chapter 7 Trustee's business judgment, as any firm the Purchaser retained to perform the On Lot Sewage Inspection would not have been retained as a neutral party owing duties to the Chapter 7 Trustee as well as the Purchaser. As such, any perceived conflict the Engineer had would have existed with respect to any professional retained. The Chapter 7 Trustee has significant experience in bankruptcy and testified that he has sold many properties as a bankruptcy trustee. The Court believes he is sophisticated and experienced enough to evaluate the Engineer's report with the understanding that it was prepared by a professional retained by the Purchaser, without dismissing the report's conclusion out of hand as biased and stilted to result in a reduced purchase price.

Nor does the Court attribute any merit to the Antunes' argument that the Pineville Property was not properly marketed because the sale sign physically located at the property was not visible for some period of time. Mr. Astrella testified that the property was listed on hundreds of websites for 18 months,

---

[76] The Court's finding that the Purchaser is a good faith purchaser stands in stark contrast to the Antunes with respect to their offer. The Antunes' inability to even verify that they did not retain and use property of the estate, with respect to the $25,000.00 deposit or otherwise, resulted in the Court's determination that they were not good faith purchasers at any price.

17

as well as marketed to his contacts. The prospective purchasers who inquired about the property evidently were not hindered by the possible lack of a sale sign at the property in learning it was for sale and whom they should contact to inquire and arrange site visits. In the day and age of the internet and multiple site listings, the Court finds that, to the extent the physical "for sale" sign was not visible at the Pineville Property for any period of time, this did not diminish the fulsome marketing of the property for sale or the market's reaction to the property.

Finally, the Court gives little weight to the Debtor's testimony that the Pineville Property is worth $460,000.00. His testimony in this respect was based on vague and unsubstantiated statements regarding the value of other properties in the area of the Pineville Property. Moreover, even the Debtor admitted that these "comparables" did not possess the uniquely disadvantageous characteristic of being unsuitable for development. The Debtor's testimony regarding value was unconvincing, and does not substitute for the clear evidence of value presented by the lack of interested purchasers for the property after 18 months of marketing.

### IV.    CONCLUSION

For the reasons stated herein and on the record, the Court grants the Chapter 7 Trustee's Revised Sale Motion and approves the sale of the Pineville Property to the Purchaser for the Final Offer of $120,000.00. The Sale Order has been entered.

Dated: February 19, 2019

MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

Roger V. Ashodian, Esquire
Regional Bankruptcy Center of SE PA
101 West Chester Pike, Suite 1A
Havertown, PA 19083

Robert H. Holber, Esquire
Robert H. Holber PC
41 East Front Street
Media, PA 19063

18

William J. Burnett, Esquire
Damien N. Tancredi, Esquire
Flaster/Greenberg, PC
1835 Market Street, Suite 1050
Philadelphia, PA 19103

Kevin P. Callahan, Esquire
United States Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA 19107

Brian R. Elias, Esquire
Wisler Pearlstine LLP
460 Norristown Road, Suite 100
Blue Bell, PA 19422